Good morning. May it please the Court, my name is Michael Murphy, Counsel for the Democracy Council of California, and I'd like to reserve four minutes for rebuttal, please. Thank you. All right. You keep that. I'll do that myself. Thank you, Judge. So the question that is in front of this Court is, in my opinion, very simple. Based upon an undeveloped record, with at least a minimum, we would think more, of prima facie evidence of a factual dispute as to whether or not the Democracy Council of California agreed to a form selection clause, whether we should nevertheless be sent to litigate a case in Hong Kong which no one disputes, has no real connection to the facts at issue, nor to our client or our selection of the forum. So that's the very simple issue. Mr. Murphy, how do you get around the December 12, 2008 amendment, which essentially reaffirmed all of the prior clauses of the agreement, including the forum selection clause? The fact that you've identified, Judge Tomlin, is in fact the best fact that WRN has. In isolation, I would think that fact could be convincing. Well, I'm looking at the language on page 2, paragraph 2, that says, all other terms and conditions of the agreement not explicitly amended hereby shall remain in full force and effect. And if I look at that agreement, it contains the Hong Kong forum selection clause. Well, the statement that you made is actually pregnant with an ambiguity, and this is the issue. To say the general terms and conditions presumes that there is an identifiable document that contains all of the general terms and conditions. We've presented substantial and at least prima facie evidence that there is no identifiable document, which we all know is one of the requirements for incorporation by reference. Here's some of the evidence that we've presented. Let me make sure. The general terms and conditions document that I'm looking at is the one in AR 58, which was signed only by a representative of WRN media on the 27th of November, containing paragraph 16, which is the forum selection clause, is it not? That is correct. And where in the record do we have a different terms and conditions document? It's not that there are different terms and conditions, it's that there is no document that memorializes all the terms and conditions that we had agreed needed to be in that document. There was no mutual assent to that document. Why doesn't the language of the December 12, 2008 amendment, which is signed by representatives of the Democracy Council and WRN media, sufficient to cure that problem and in essence incorporate by reference the November document that we were just talking about? We've identified, all parties agree, that a signature is evidence of an agreement. However, we can also look at various different facts that suggest there was no assent to the general terms and conditions that they're now promoting as having been incorporated by reference. I just don't understand how I can agree with that statement when I look at the later in time fully signed ratification document. Okay, well, I have an additional piece of evidence. I actually think that the failure to incorporate 4.9, right, which if you recall earlier in the negotiating process, we had insisted that we needed some assurance that the agreements were parallel. We, in fact, told them we couldn't enter into an agreement. If you look at the excerpts of record, page 202, Sandy Millar, counsel for the Democracy Council, sends an email saying, if we cannot have assurance that the agreement with you is parallel to the agreement with the satellite provider, we can't have an agreement. So the proposal was 4.9, which was identified in a subsequent. But if that was true, then why did Mr. Prince on December 11, 2008, sign the amendment to the service order? Well, the evidence that we presented to the court also shows that Mr. Prince and Mr. Millar were led to believe that there were no general terms and conditions, that more negotiations needed to occur. Mr. Cohen himself has admitted that when Mr. Millar said, I understand that general terms and conditions will be negotiated at a later date, Mr. Cohen concedes that he acquiesced to that statement, leading us to believe, contrary to his actual belief, that the general terms and conditions remain to be negotiated. So is your position that because the relationship between the parties fell apart after December 2008, the reason you can't produce a different terms and conditions document is those terms still remained unresolved and then the deal fell apart? Precisely. There was absolutely no meeting of the minds on the general terms and conditions to begin with as a threshold matter. And second, I mean, so that's the validity of the contract. As a subsequent matter, it's also the fact that Bremen says that there's fraud or overreaching. Those are harsh terms, but I do think it is overreaching to say, oh, yeah, you could just execute that part of the agreement. The rest of it we'll deal with at a later date and actually believe that the rest of it, whether or not you've negotiated, is actually a part of the agreement. Counsel, go ahead. Well, I was going to say, just to alert you so you can focus on it in your argument, that what bothers me about your client, about Appellant's position here, is that in contract law we almost always are looking at manifest expressions or what intention was made manifest by the parties. And when they sign the agreement, that really strongly looks like they agreed to the general conditions, including the forum selection clause. And that's true even if they earlier expressed question about it. When they sign the agreement, that's a big step. So why didn't your client, when they signed the agreement, send an email or a letter or an annotation saying, but we're not agreeing to this general condition? Judge Gould, are you talking about when, in October of 2008? When they signed the service order? Correct. Correct. So the question is, why did my client not send an email when we signed the service order for him saying, but we're carving out the forum selection clause? Is that your question? Right. You're trying to carve it out now in your litigation position. But how did they express their intention to carve it out when they formed the contract? They did, Your Honor. My client's counsel sent an email saying, well, actually, let's back up. Jim Prince said, you know, we've still got these big issues on the general terms and conditions. One of those issues is we need a term that assures us that there is a parallel, that the agreement with you is parallel to the agreement with the satellite provider. WRN proposes an agreement, a term. They don't like the language. So my client says, okay, well, we'll sign the service order form while we wait and continue negotiating the general terms and conditions. And the response from WRN was, great, please sign and fax the service order form. So although it was not an explicit email carving out that term, it was the objective evidence of the communications between my client and WRN establishes that everyone understood that the general terms and conditions were not going to be entered into and were not part of the agreement. Is there a written statement, either by annotation of the service order or an email or a letter, a written statement at the time the contract was formed that says, we are not agreeing to the general conditions? No, those words, no, but I think it's the objective. Any reasonable person reading the emails would conclude that, you know, there has been no agreement on the general terms and conditions. That was the email from Jim Prince to WRN that I just referred to, says, well, while we continue negotiating the general terms and conditions, I'll just sign the service order form. That essentially says. What was the date of that email? Aren't these emails all in October? That email was before the service order form was signed. That's the problem we're having, counsel, is the argument you're making is based on discussions that were occurring in October. The first document wasn't signed until November, and then the ratification document is signed in December, and there's no evidence in the form of emails or written exceptions or anything that would alert an objective reader to the fact that terms still remained unresolved. Well, actually, there is some ambiguity regarding the dates on which the agreements were signed. The amendment refers to November 1st. Actually, the service order form was signed on October 27th. You still don't have any emails after October, do you? That is correct. But the contemporaneous communications on the day that the service order form was executed establishes that the general terms and conditions, we were far apart on the most central term. The date even acknowledged in their briefs was an economic necessity, that we had a guarantee that the terms with them were the same as their terms with the satellite provider. That economic necessity had not been represented in the agreement yet, and that deal point we emphasized was necessary. And so as long as we don't have the language there, let's just sign the service order form and we'll continue negotiating. That was the contemporaneous understanding on the date the service order form was entered. But there is nothing, to answer Judge Gould's question, there is nothing in writing on or about December of 2008 that says that. That is correct, Your Honor. That is correct. Why, if that was so important, wasn't that written on these papers? Well, I think there are a variety. In October of 2007, for example, the time pressure had been ratcheted up. And, for example, my client's lawyer or my client sent an email on October 27th saying, can I have some time for my lawyer to read this? And the response of Jeff Cohen was, I don't think that will work. I don't think we have the time to do that. So the evidence and the reasonable inferences to be drawn from what we presented to the court below was that the pressure had been ratcheted up to the point where we didn't have time to even have our lawyers sit down and say, sign this part, don't sign it. So the idea was, if you don't sign up with us, we're going to give your satellite station to somebody else. Absolutely. Well, correct. Correct. The time pressure was also – we were working with – there were various moving parts. You've got the federal government. You've got your contracting parties. We're trying to assemble a satellite station here. So we had to get this thing live very quickly. I have two minutes left. I'm going to sit down and respond on rebuttal. Thank you. Well, you know, that's a common technique. If we don't get it done today, it's not going to get done. The real estate brokers use that a lot. That's correct, Your Honor. Okay. Thanks, Burke. Good morning, Your Honor. Peter Yu from Greenberg Troward, representing the appellees. May it please the Honorable Court, allow me, if you may, to jump right into this. The district court's decision below, dismissing the district court's decision, on the grounds of improper venue, should be affirmed. District court's decision is a marvelous document, and it considers the entire record, not just certain e-mails, as appellant suggests, but it considered both the e-mails, the signed agreements, which Judge Tallman focused on, both in late October and also in December of 2008, and also the underlying provisions of the general terms and conditions, and in particular, Clause 14.2, which is the amendment provision that is in the general terms and conditions. And allow me to explain why the district court's decision is correct and well-reasoned. The district court observed that the appellant signed the service order form after having an opportunity to make handwritten notations, changing whatever contractual language that it deemed appropriate, but did not do so with respect to the reference to the general terms and conditions, meaning that it acknowledged that the general terms and conditions was indeed part of the party's underlying two-part agreement that consisted of the service order form and the general terms and conditions. Jim Prince, appellant's president, affirmatively acknowledged that fact by stating in his declaration that he thought as of October 27, 2008, that at most the parties would quickly complete negotiations with respect to the general terms and conditions. So what do we do? We do not delete it. We keep it in. Now, if the parties want to preserve the right to continue to negotiate and to modify, what would they do? They would discuss and negotiate, try to strike a consensus on the contractual language, and then memorialize the modification in a writing. That is the exact same procedure that is outlined under Clause 14.2. So what does that mean? The parties entered into the agreement signing the service order form that expressly references the general terms and conditions. The general terms and conditions, therefore, was a part of the agreement and applied, including the Clause 14.2, which is the amendment provision. If the parties wanted to make further modifications, be it a Clause 4.9, Clause 8.3.1, whatever it is, what were they supposed to do? They would continue to negotiate, exchange drafts, and then enter into a signed, written amendment. In this case, that's exactly what happened. The parties signed the service order form, and if they wanted to amend the terms, they did so in December of 2008. What is most significant about the amendment, as Justice Tallman pointed out, is that appellants had 45 days between October 27, 2008, and December 12, 2008, to dispute the validity, the enforceability, the inclusion of the general terms and conditions as part of the parties' agreement. It did not do so. Instead, after 45 days, what the appellants did was to sign a second document that is even more explicit than the service order form or the general terms and conditions. And what it said, as Justice Tallman noted on page 2, is it says in plain language, the agreement is two documents. It consisted of the service order form and the general terms and conditions. For that reason, if you look at the record altogether, the emails are not inconsistent. Contrary to what appellants suggest, the emails do not suggest that the general terms and conditions had been somehow excised from the parties' agreement. It was always in there. It was meant to be there. The first draft of the documents included it. When it was signed, it was expressly referred to as being part of it, and the parties continued to seek, maybe, negotiations, which, in fact, according to the record, didn't occur. And that's a significant point with respect to Clause 4.9. Judge Pergersen noted that if it was so important, this Clause 4.9, why was it not included in the first case? Appellants' counsel's response was time pressure. Well, maybe there was time pressure, but maybe not. According to the record, what Clause 4.9 was is really a superfluous, last-minute, belt-and-suspenders approach, where the counterparty, which is WRN Media Ltd., and I'll refer to it as WRN Hong Kong, simply... It was a belt-and-suspenders... You said it was a belt-and-suspenders approach. Yes, it was a belt-and-suspenders approach to offer some extra insurance, extra comfort, as you may, to the appellant. It was not a term that was material. It was not a term that was expressly bargained for. Why? Why was it superfluous? It's because the underlying provisions within the general terms and conditions that must be part of the agreement does, in fact, parallel, and were supposed to parallel with this other parallel agreement between WRN Hong Kong and the satellite provider. The parties negotiated that point. As appellant's counsel points out, it was an issue with respect to the addendum. It was rejected. Appellant's response was, well, we tried. We sought to include it. We couldn't negotiate and get to a consensus. That was it. The parties agreed. 4.9 is a throwaway. It was WRN Hong Kong's hope to placate everyone, to give appellant extra comfort, but it's not a material term. The general terms and conditions are the provisions that are economically and practically necessary, not Clause 4.9. And if I may just address the other point with respect to the fraud argument. Tell me why 4.9 is a throwaway. It's a throwaway because the parties negotiated that in the addendum it was suggested that there was an express provision saying that all the terms in the parallel agreement would be reflected in the underlying agreement between appellant and WRN Hong Kong. Obviously, as WRN Hong Kong is a broker, in fact, to secure satellite television broadcasting services, there will be ins and outs, minor ins and outs, between WRN Hong Kong's agreement with appellant and WRN Hong Kong's agreement with the satellite provider. For the essential terms, those had to be the same, in terms of the length of the agreement, the price, terms with respect to what happens if the satellite experiences a solar flare, for instance. Those issues are the same. That's why the parties inquired about it from the outset. Appellant's counsel, Sanford Malark, did, in fact, inquire about it. The response that appellant got was, well, we can't give you that agreement, especially since it did not exist at the time. It was still being negotiated in parallel. What we would give you is a heads-up agreement, which is the term sheet, essentially, of the transaction between WRN Hong Kong and the satellite provider. Once that is in place, and that is the course of negotiations with respect to those issues, those negotiations were finished, completed. At the very last moment, within hours before the actual deadline to enter into the agreement, WRN Hong Kong offered, well, why don't I give you 4.9? I don't know if this is the language that I can give you, but let's try. Appellant's position was, well, if it seems like a good idea, let's make sure we include it. WRN Hong Kong's response was, well, we're still working on the language. We'll hold off on that. We can't guarantee you that. Of course, if 4.9 was that important to appellant, appellant should have continued to pursue the issue and ask for a modification, ask for an amendment. There is no record of those issues because it was, in fact, not important. Just to make sure I understand, I'm looking at ER 52, and is it significant that paragraph 4.9 is missing from that document because the satellite provider would not agree to disclose to, through WRN Hong Kong, the specific terms? That is correct. Is that what you're saying? That is correct. Okay, so for confidentiality reasons, they didn't want the DDC to know what their specific, I don't know, pricing structure or whatever it might be. I understand that it's not in the record, but obviously there are concerns on both ends, from the satellite provider's end about business concerns and also from WRN Hong Kong's perspective because it's broken. So there are obviously certain limitations as to how much in terms of paperwork that flows through from one end to the other. Well, how much proprietary business information they wanted to see. Yes, and also pricing information, arrangements, those types of issues. So that's why there is no 4.9 on here. There is no 4.9 because the underlying material terms had been incorporated in the general terms and conditions. There was no need for a 4.9. If I can, let me just address some of the case law. The case law is essentially, there is no disagreement by the parties with respect to that. The Meyer case, which refers to Justice Tomlin's point, when you sign an agreement, basic horn book contract law, you are deemed to have assented. That's primary, if not dispositive, proof that the parties agree to the terms of a written agreement and you are bound by the terms therein. There is also the Shaw case, which talks about essentially the same thing, signing an agreement that allows for incorporation by reference. That is dispositive proof of intent to incorporate another document into a signed agreement. Both of those cases fully support and substantiate the district court's ruling in this case. Appellant also suggests that there is this issue about a contract of adhesion. Frankly, the argument is specious at best. The agreement was formally negotiated. There were changes made. Appellant's input was incorporated into the underlying agreement. It is the adhesion argument similar to the general reasonableness argument under the Brayman factors. They're really red herrings. The contract of adhesion argument is really to lure the court to consider the agreement from a fairness perspective. This is not a contract of adhesion. Fairness is not an issue. The terms of the contract should be enforced. General reasonableness is not a factor that is permitted under Brayman. The Ninth Circuit has considered this. In the Pelleport case and the Argueta case, the Brayman terms are what they are. There is no fraud with respect to the forum selection clause because, as the court noted, the forum selection clause was never objected to. There was one email where Mr. Millar noted that he wanted to give the jurisdiction some thought. He didn't come back to WRN Hong Kong and object expressly with respect to the forum selection clause. Two days after that first email, on October 21st, 2008, he sent a three-page typewritten memo full of comments on the agreement, and still he did not raise an objection, an express objection about it. Finally, with the appellant, when they signed the service order for him, last clear chance. Strike out the reference of general terms and conditions if you want, or if you want to narrowly tailor your objection, write it down, as the panel suggested, that the forum selection clause is not accepted. On all three occasions, appellants did nothing. Instead, they signed the written instruments twice, both saying that the general terms and conditions shall be in full force and effect. All of those terms in the agreement that consist of both the service order form and the general terms and conditions should be enforced, both as a matter of contract law and under the Brayman test. The district court's decision should be affirmed. Thank you, Your Honor. Thank you. I'd like to close with addressing this issue of the parallel agreements. First, counsel refers to a fact that is not in the record, that there was no this term was a throwaway. In fact, their brief contradicts this fact. In their brief, they say that the parallel nature of our agreements was an economic necessity. We agree with that. And I'm going to provide some citations to the record that establish that this was a material term, the absence of which. I can certainly understand why your client would want to make sure it was getting the best economic deal on the most favorable terms that the satellite provider was offering to WRN Hong Kong. But the problem I'm still having is if it was so important to your client, once WRN Hong Kong said, I've asked the satellite provider and they're not willing to disclose that information. It's proprietary business information. The only remedy at this point that your client had was to say then we can't close the deal. Or the alternative remedy so that we can work towards getting a deal done is we'll sign this part and we'll continue negotiating the rest. But it never objected to the forum selection clause. That's what you're here before us on. Well, the forum selection clause had been triggered as an issue. And the court read an inference. Triggered as an issue? It is obliquely referred to by Mr. Millar saying I need to give it some thought. And then he sends a three-page typewritten letter with real concerns that he has about the contract. And conspicuous by its absence is any reference to the forum selection clause. And then your client signs the contract document. Actually, Judge Talman, in that memo that you're referring to, there actually is a section in that memo that incorporates by reference, if I might use the term, the prior comments regarding the forum selection clause. You said you already have my comments regarding the general terms and conditions. That memo actually focuses on the service order form. You and I read the document a little differently. I don't see it as quite as strong a concern as you're elevating it. What is it that makes you want to back out of this deal? Well, it's not so much that we want to back out of the deal. We'd like to. The problem is that all the things that we had been promised in the September 18th meeting had fallen apart. No license. The entire deal had fallen apart. And the relationship with WRN had completely unraveled. And so, you know, at this point, at this stage in the game, we now have a default judgment in Hong Kong that they're now trying to domesticate here. The significance of what's presented in this court is substantial. And all we're asking is that the courts, the lower courts' reading of inferences against us and making factual conclusions on disputed facts be reversed and just send us back so that we can really flesh this stuff out so I can actually cross-examine their guy. On this specific issue, that's all we're asking for. Thank you. Well, shouldn't you have thought of all this before your client signed those papers? Well, I think there were a lot of factors, again, that we presented to this court showing why the frenzy that had been created by WRN and really their disinclination to allow us to even have our lawyers review this is one explanation. So, you know, there was a real frenzy of negotiations that's reflected in the e-mails. And at the end of the day, we wanted to lock in the Hotbird satellite, but we also needed some assurance that they were not hiring a company in Israel that was going to create actually national security concerns, and yet they wouldn't disclose to us the identity of the satellite provider or the terms of that agreement. That really is why all this stuff blew up. So then you should have just walked away from it. Well, and that's what happened in February of 2009, Your Honor. Well, when you couldn't get it all in one time on a piece of paper. Actually, the other argument that I would make, Your Honor, is that it actually is a good thing that it unraveled. The fact that they've now admitted that they retained a company based in Israel, despite our instructions, would have had profound national security concerns. And as we're seeing what's going on in the Middle East right now, that's substantial. National security concerns about what? Well, if we are engaging in pro-democracy work in a country with an authoritarian regime, and it becomes – I'm not at liberty to say that. This is all – we have to be very careful. I'll tell you when we get there. But the issue is this. I mean, this has been disclosed in WikiLeaks. I mean, this has been an issue. And the issue is if this authoritarian regime learns that a satellite channel is being beamed into their country using an Israeli corporation, that has severe implications. And so we had to prevent that from occurring. And it turns out that the whole time they had contracted with SatLink, an Israeli corporation, that's the satellite provider we're talking about. The reason why they wouldn't give us the terms of the agreement is because then we would have found out that they were doing something that was going to not only violate our agreement with the federal government, but it was going to cause – have real concerns that, again, we've now seen disclosed in WikiLeaks, the Washington Post. This is serious stuff. And all we wanted to know is assurance that they had not hired an Israeli corporation. And they wouldn't give us that. That's why the parallel terms is such an essential deal point. Well, and then a default judgment was entered against you. That is correct. And did you make an appearance in Hong Kong? We made an appearance. We could not afford to litigate there, and we have no connection. We're also not allowed to litigate there. Did you make an appearance before the court in Hong Kong? We made one appearance, and then we had to default. We couldn't afford to litigate there. I'm not talking about litigating. You could have brought all these problems you have before the court in Hong Kong. We're actually not allowed under the regulations of our grant to submit to a jurisdiction of a communist nation. Actually, we would not have been allowed to litigate. I mean, you're saying Hong Kong is a communist nation. Yes, Your Honor. You've been there. That is one of the prohibitions. Because it is a communist country, we would not be allowed under the governing regulations of our relationship with the federal government to have submitted to a jurisdiction in that country. But aren't some of the judges on the bench over there, aren't they the same people that were there when Hong Kong was independent of China? You know, that's a good question. I don't know, and I don't know if this judge in particular was, but it's really a matter of, you know, it's really not even our decision to make. These are the restrictions that we operate under when we have a relationship with the federal government. And one of those is you cannot submit to a jurisdiction in a communist nation. Those are the rules that we have to abide by. So why did you even start out with Hong Kong? We didn't want to. We never assented to that term, which is why we're here. How were you going to broadcast from Hong Kong? No, there actually was absolutely no, the only reason why Hong Kong was presented by WRN as an option for a contracting party. We didn't want Hong Kong. In fact, we don't do any work in Southeast Asia to begin with. So Hong Kong was really just a formality from WRN's perspective. Great. Thank you. Thank you. Thank you. We'll take up Judge Fagerson. Yeah, excuse me. I was wondering if we could take a break. Absolutely. Either now or after cruise. Probably now is better. This would be a good time, yeah. Okay. We're going to do it now. All rise. This court stands in recess.
judges: Pregerson, Gould, Tallman